HUNTER, JR., Robert N., Judge.
 

 *813
 
 Anthony Edward Messer ("Defendant") appeals a jury verdict convicting him of first degree murder and robbery with a dangerous weapon. On appeal, Defendant argues the following: (1) the trial court erred by denying his motion to dismiss because the State failed to establish the
 
 corpus delicti
 
 of the charge of robbery with a dangerous weapon; and (2) the trial court erred by denying his motions to suppress his in-custody interview by law enforcement officers, his clothing, and the results of his DNA testing. We find no error.
 

 I. Factual and Procedural Background
 

 On 16 December 2013, the Johnston County Sheriff's Department arrested Defendant on warrants for first degree murder and robbery with a dangerous weapon. Upon taking Defendant into custody and transporting him to the Johnston County Sheriff's Office, Detective Rodney Byrd interviewed Defendant for an official statement. During the interview, Defendant admitted the following:
 

 I told him to take me to Benson and uh, before we got to Benson, I told him I needed to get out and pee and when I got out, I acted like I peed, pulled a gun out of my pants, opened my door back up and shot him in the head.
 

 In the same statement, Defendant claimed he took the gun used to kill Billy from Billy's home. Defendant then stole $104.00 from Billy's wallet, dragged Billy out of the car, and left. Defendant said he then went to "the crackman's house."
 

 After the interview, Detectives seized the shirt Defendant wore during his arrest, because it "appeared to have mud and blood on it." Detectives then placed him into custody at the Johnston County Detention Center. On 22 January 2014, Detective Byrd obtained a warrant to seize a DNA sample from Defendant with a saliva sample.
 

 On 15 May 2015, Defendant moved to suppress the results of his DNA test. He argued the probable cause affidavit in support of the search warrant "[wa]s insufficient." Defendant also moved to suppress the statement he made to Detective Byrd on the night of his arrest because he "was too impaired after a day of drug use and drinking to understand his Miranda rights and to knowingly and intelligently waive [the] same."
 

 On 12 October 2015, the trial court held a suppression hearing for Defendant's motion to suppress his in-custody statement. At that time, defense counsel announced he did not plan to present evidence on his
 
 Miranda
 
 rights argument. Defendant shifted his argument and claimed detectives arrested him without probable cause, and, therefore, his
 
 *814
 
 statement, DNA test, and clothing should be suppressed as fruits of the poisonous tree. The court allowed the amendment, and the State did not object to the lack of notice. The court denied all the motions to suppress.
 
 [1]
 

 *318
 
 The Johnston County Superior Court called Defendant's case for trial on 26 October 2015. The State called eighteen witnesses in total, and the evidence tended to show the following.
 

 The State first called Keith Burakowski, a Deputy Sheriff with the Johnston County Sheriff's Office. In response to a call on 16 December 2013, emergency communications dispatched Deputy Burakowski to the intersection of Hannah Creek Road and Strickland's Crossroads Road. Deputy Burakowski arrived at the scene at 11:49 a.m. He saw Billy lying on the side of the road, with a towel over his midsection. About eight to ten feet from Billy, he noticed a "black in color revolver with a brown handle[,]" which he later identified as a ".38 revolver." He immediately called for EMS because Billy "was ... gasping for breath[.]" After contacting EMS, Deputy Burakowski "secured the gun[,]" by removing one discharged and five unfired rounds of ammunition from the barrel. He placed the gun and ammunition in the trunk of his patrol car. Deputy Burakowski then "secured the area" and called the dispatch center and asked them to "run" the gun's serial number.
 

 The State next called Ricky Messer, who is not related to Defendant. Around 11:30 a.m. on 16 December 2013, Ricky drove home from a nearby rock quarry on Strickland's Crossroads Road. As he passed the intersection at Hannah Creek Road, he noticed Billy's body lying on the side of the road, with his pants around his knees. Ricky knew Billy "virtually all [his] life[.]" However, Ricky did not immediately recognize Billy, because he was lying on his side and blood covered his face and hair. Ricky also saw a denture plate and pair of glasses lying nearby.
 

 The State then called James Dwayne Dorman.
 
 [2]
 
 On 16 December 2013 at around 11:30 a.m., James and his wife, Kim, returned home from shopping at Food Lion in Benson. James and Kim came upon Billy at the same time as Ricky. James's description of the appearance and location
 
 *815
 
 of Billy's body on the side of Hannah Creek Road largely matched Ricky's account. He only added that his wife
 
 [3]
 
 covered Billy's midsection with a towel.
 

 Christopher Shambaugh next testified for the State. He works for the Johnston County EMS and responded to Deputy Burakowski's call. He arrived at the scene at 11:50 a.m. He did not detect a pulse or heart beat anywhere on Billy's body and declared Billy dead around 11:57 a.m.
 

 The State called Billy's youngest son, Robert Dale Strickland.
 
 [4]
 
 Dale lived with his father for "all [his] life[.]" Dale and Defendant were "friends," and grew up in the same neighborhood.
 

 On the evening of 15 December 2013, Dale visited his cousin. At approximately 9:00 p.m., Defendant called Dale and asked to stay the night at his home. Defendant explained he and his father argued earlier in the evening. Dale told Defendant he was not home, but Defendant could go to his home because Billy was there. Around 9:30 p.m., Billy and Defendant picked Dale up, and they all returned to Billy's home.
 

 Later in the evening, Defendant repeatedly asked Dale if he knew where they could find drugs. Defendant gave him some "empty bags and straws and stuff, paraphernalia, whatnot.... " Defendant told Dale he knew "two elder[ly] people that ... he could get some money from ..., but he would have to kill them to get it[,]" by "put[ting] two bullets in their head[s]." Hoping to move away from this subject, Dale discussed guns because they are his "go-to" hobby. Defendant persisted, and Dale eventually told Defendant he would try to get some drugs in the morning. The two went to sleep between 4:00 a.m. and 5:00 a.m. in the morning.
 

 *319
 
 On the morning of 16 December 2013, Dale awoke around 11:00 a.m. and found the home empty. Dale looked behind the recliner in the living room, where Billy normally kept one of his guns, a black, .38 special revolver with a wooden handle. However, Dale could not find it. Dale noticed Billy's medicine bottles appeared "gone through and turned over ... just like somebody searching for something." Dale also noticed an empty spot in Billy's used car lot adjacent to the house, where a gold Chevrolet Malibu usually sat. Dale called Billy's cellphone several times,
 
 *816
 
 but Billy did not answer. Dale never called the police because "it was Monday and on Mondays my dad goes to the car sale every Monday, and you know, I assumed, you know, I didn't assume the worst."
 

 Between 12:30 p.m. and 1:30 p.m., officers came to Billy's home. When Dale saw them turn into his driveway, he thought they wanted to arrest him because he "was involved in drugs[.]" He ran into the woods and called his boss, James, and asked for a ride. James picked Dale up and took Dale to his cousin's home. At some point during this interaction, Dale asked James to create a false alibi for Dale if law enforcement contacted him. During Dale's visit at his cousin's home, his uncle stopped by and told Dale Billy died that morning.
 

 Dale returned home around 6:00 p.m., where Detective Byrd waited for him. Though he first lied to Detective Byrd regarding his whereabouts that day, he eventually conveyed to Detective Byrd the above testimony.
 

 The State then called Detective Byrd. He works as a detective for the Johnston County Sheriff's Office and investigated Defendant's case. On 16 December 2013, he received instructions to go to the intersection of Hannah Creek Road and Strickland's Crossroads Road. He arrived at 12:48 p.m. His description of the crime scene and Billy's appearance matches that of Ricky Messer and both the Dormans. Detective Byrd noticed a wallet in Billy's back pocket, which contained Billy's I.D. and a few cards, but no cash.
 

 That afternoon, Detective Byrd went to Billy's home with Detectives Don Pate and Kevin Massengill. They found the door ajar and did not find anyone in the home or on the property. Finding no one, Detective Byrd went to give a "death notification," to Chris Strickland and other family members. Around 6:15 p.m., Detective Byrd interviewed Dale when Dale returned home from his cousin's home.
 

 When asked why he and other detectives "went looking for Andy Messer," Detective Byrd replied:
 

 Based on the phone call from Mr. Messer to Mr. Danny Stanley, in [the] interview with Mr. Strickland, the fact of the defendant Mr. Andy Messer stayed the night before, and when Mr. Strickland woke up, both Andy Messer and his father were missing, along with [sic] .38 Special, I began looking a little harder for the defendant Mr. Andy Messer.
 

 After interviewing Dale, Detective Byrd went to Defendant's home, hoping to locate him. While there, detectives received a phone call
 
 *817
 
 and drove to I-95 in Cumberland County near mile marker sixty-one. There, Detective Byrd saw another detective place Defendant in handcuffs. Detective Snipes transported Defendant to the Johnston County Sheriff's Office.
 

 Back at the Johnston County Sheriff's Office, Detective Byrd interviewed Defendant around 8:10 p.m. At this point in the trial, the State moved to introduce a video recording of Defendant's in-custody interview into evidence. Defendant objected, preserving his motion to suppress for appeal. The trial court overruled Defendant's objection and the State played the recording for the jury.
 

 In the recording, prior to questioning Defendant, Detective Byrd gave Defendant
 
 Miranda
 
 warnings, which Defendant waived. Defendant confessed to killing Billy and stealing $104.00 from Billy. At the conclusion of the interview, Detective Byrd arrested Defendant.
 

 The State then called Dr. Lauren Scott. As the Associate Chief Medical Examiner, she performed the autopsy on Billy. She determined Billy died from "[a] gunshot wound to the head." She found two gunshot wounds, an entry wound on his right temple and an exit wound on his left temple. Billy's head also
 
 *320
 
 showed signs of "bleeding in between the brain and the membranes that surrounds the brain ... bruises or contusions to the brain itself ... [and] many fractures at the base of the skull."
 

 The State called Detective Massengill of the Johnston County Sheriff's Office. Detective Massengill assisted the investigation for Billy's case. He helped locate the missing gold Chevy Malibu, based upon Defendant's interview with Detective Byrd. Officers found the car down a path in a wooded area in Cumberland County.
 
 [5]
 

 The State then called Jennifer Whitley of the Johnston County Clerk's Office.
 
 [6]
 
 On 17 December 2013, Jennifer saw "a name that [she] recognized[,]" on the court's initial appearance list. Once she saw Defendant, Jennifer told a co-worker she knew Defendant's father. Defendant overheard Jennifer and spoke with her. Defendant told Jennifer "[his father]
 

 *818
 
 got [Defendant] hooked on drugs and that [his father] was able to get off and that [Defendant] wasn't, and that's why [Defendant] blew that m-----f-----'s head off yesterday." Jennifer told Detective Byrd.
 

 The State called Detective Liza Langdon, a crime scene investigator for the Johnston County Sheriff's Office. She arrived at the intersection of Hannah Creek Road and Strickland's Crossroads Road at 12:48 p.m. Detective Langdon worked closely with Detective Mazur in gathering and securing evidence at the scene of the crime. She took photographs of the scene, the .38 Smith and Wesson revolver and ammunition Detective Burakowski secured, the wallet in Billy's back pocket, the glass fragments in the road, the dentures, and the eyeglasses.
 

 Later that evening, Detective Langdon drove to Wade, North Carolina, where other detectives found the missing Malibu. She secured the car and searched it, after receiving a search warrant. Pursuant to the search warrant, Detective Langdon collected suspected blood, a pink lighter, a cigarette butt, pieces of glass, and clothing.
 

 On 22 January 2014, Detective Langdon took swabs of Defendant's cheek. Detective Langdon sent these cheek swabs, along with items from the autopsy, the vehicle, and from Defendant himself, to the State Crime Lab on 7 February 2014.
 
 [7]
 

 The State called Agent Martha Traugott, a serologist at the North Carolina State Crime Laboratory. As a serologist, she "identif[ies] body fluids on cases in any sort of criminal case[,]" such as "blood, semen, or saliva." Agent Traugott analyzed the body fluids present on the evidence for Defendant's case and determined Defendant's shirt contained a blood stain.
 

 The State next called Agent Michelle Hannon, a DNA analyst at the State Crime Laboratory. She tested the evidence against the DNA from Defendant's cheek swab. In her expert opinion, the blood on Defendant's shirt matched the DNA profile of Billy Strickland. She tested the cuttings from Billy's coat and determined those DNA profiles "[were] consistent with mixtures of at least two contributors." She could not further identify the DNA profiles due to "insufficient quality and/or quantity." Agent Hannon also tested the gun but did not obtain "a profile that was interpretable."
 

 *819
 
 The State rested. Defendant moved to dismiss all charges. The court denied both motions. Defendant did not present any evidence and renewed his motions to dismiss. The Court denied the motions.
 

 On 6 November 2015, the jury found Defendant guilty of robbery with a dangerous weapon and first degree murder premised
 
 *321
 
 upon felony murder, but not premeditation and deliberation. The court arrested judgment on the robbery with a dangerous weapon charge and sentenced Defendant to life imprisonment, without parole. Defendant gave oral notice of appeal in open court.
 

 II. Standard of Review
 

 Regarding the motion to dismiss, "[t]his Court reviews the trial court's denial of a motion to dismiss
 
 de novo
 
 ."
 
 State v. Smith
 
 ,
 
 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007) (citation omitted). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied."
 
 State v. Fritsch
 
 ,
 
 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (2000) (citations and quotations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Smith
 
 ,
 
 300 N.C. 71
 
 , 78-79,
 
 265 S.E.2d 164
 
 , 169 (1980) (citations omitted).
 

 Second, our review of an order deciding a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619 (1982) (citations omitted). "The trial court's conclusions of law ... are fully reviewable on appeal."
 
 State v. Hughes
 
 ,
 
 353 N.C. 200
 
 , 208,
 
 539 S.E.2d 625
 
 , 631 (2000).
 

 III. Analysis
 

 We review Defendant's arguments in two parts: (A) his motion to dismiss; and (B) his motions to suppress.
 

 A. Motion to Dismiss
 

 Defendant first argues the trial court erred in denying his motion to dismiss the charge of robbery with a dangerous weapon because the State failed to establish the
 
 corpus delicti
 
 of that crime. Specifically, Defendant contends the State relied solely on his uncorroborated
 
 *820
 
 confession to law enforcement officers, which is insufficient to establish guilt. We disagree.
 

 Corpus delicti
 
 means "the body of the crime," and typically describes "the material substance on which a crime has been committed."
 
 Black's Law Dictionary
 
 419-20 (10th ed. 2014). As a modern doctrine, the
 
 corpus delicti
 
 rule states "no criminal conviction can be based upon defendant's extrajudicial confession or admission, although otherwise admissible, unless there is other evidence tending to establish the corpus delicti."
 
 State v. Smith
 
 ,
 
 362 N.C. 583
 
 , 590,
 
 669 S.E.2d 299
 
 , 304 (2008) (citation and quotation omitted).
 

 Various cultures adopted iterations of the
 
 corpus delicti
 
 doctrine for centuries to guard against the wrongful convictions of innocent defendants.
 
 Id.
 
 at 589,
 
 669 S.E.2d at
 
 303-04 ; Brian C. Reeve,
 
 State v. Parker: North Carolina Adopts the Trustworthiness Doctrine
 
 ,
 
 64 N.C. L. Rev. 1285
 
 , 1290 (1986). As early as 2250 B.C.,
 
 Hammurabi's Code of Laws
 
 "required one accusing another of a capital offense to prove his case or else be put to death."
 
 Smith
 
 ,
 
 362 N.C. at 589
 
 ,
 
 669 S.E.2d at
 
 303-04 (citing Robert Francis Harper,
 
 The Code of Hammurabi King of Babylon about 2250 B.C.
 
 § 1 (2d ed. 1904)).
 

 However, the modern doctrine regarding the need to corroborate a defendant's testimony took root in the common law of England with
 
 Perry's Case
 
 .
 
 Id.
 
 at 590,
 
 669 S.E.2d at 304
 
 .
 
 Perry's Case
 
 involved a defendant who confessed to a murder of a missing man and incriminated his mother and brother in the confession.
 
 State v. Dern
 
 ,
 
 303 Kan. 384
 
 , 401,
 
 362 P.3d 566
 
 , 577 (2015). Although the mother and brother repeatedly denied all wrongdoing, the court convicted all three and sentenced them to death.
 

 Id.
 

 at 400
 
 ,
 
 362 P.3d at 577
 
 . The supposed victim turned up alive years later.
 

 Id.
 

 at 400
 
 ,
 
 362 P.3d at 577
 
 .
 

 Thereafter,
 
 corpus delicti
 
 cemented itself into the English common law.
 
 See
 

 Smith
 
 ,
 
 362 N.C. at 590
 
 ,
 
 669 S.E.2d at 304-05
 
 . However, "no definitive rule emanated from the English courts," and, therefore, American jurisdictions adopted different versions of the rule.
 
 Id.
 
 at 590,
 
 669 S.E.2d at 305
 
 . Almost all
 
 *322
 
 American states adopted some form of
 
 corpus delicti
 
 into their common law, and a few have codified it.
 
 See
 
 Reeve,
 
 supra
 
 at 1290-91, n. 53 (citation omitted). Only Massachusetts allows "a criminal conviction based solely on a defendant's confession without extrinsic corroboration."
 
 Id.
 
 at 1290, n. 49 (citations omitted).
 

 Corpus delicti
 
 has existed in North Carolina case law since the eighteenth century.
 
 Smith
 
 ,
 
 362 N.C. at 592
 
 ,
 
 669 S.E.2d at 305
 
 (citation
 
 *821
 
 omitted). For almost two hundred years the rule stood, "a conviction cannot be sustained upon a naked extrajudicial confession. There must be independent proof, either direct or circumstantial, of the
 
 corpus delicti
 
 in order for the conviction to be sustained."
 
 State v. Green
 
 ,
 
 295 N.C. 244
 
 , 248,
 
 244 S.E.2d 369
 
 , 371 (1978).
 

 This evidentiary requirement applied to all confessions and admissions until 1985, when the North Carolina Supreme Court decided
 
 State v. Parker
 
 ,
 
 315 N.C. 222
 
 ,
 
 337 S.E.2d 487
 
 (1985). In
 
 Parker
 
 , our State's highest court loosened the "quantum and quality" of corroborative evidence needed to satisfy
 
 corpus delicti
 
 .
 
 Smith
 
 ,
 
 362 N.C. at 592
 
 ,
 
 669 S.E.2d at 306
 
 . The North Carolina Supreme Court adopted a version of
 
 corpus delicti
 
 known as "the 'trustworthiness' doctrine, which focuses on the reliability of a defendant's confession rather than independent evidence of the
 
 corpus delicti
 
 ." Reeve,
 
 supra
 
 , at 1290-91;
 
 Parker
 
 ,
 
 315 N.C. at 236
 
 ,
 
 337 S.E.2d at 495
 
 .
 

 Writing for a unanimous court, Justice Billings cited three reasons for loosening the traditional
 
 corpus delicti
 
 doctrine. First, because the doctrine imposes a strict burden of proof on the State for all crimes, "the results obtained through application of a rule requiring independent proof of the
 
 corpus delicti
 
 will not be consistent or comparable[.]"
 
 Parker
 
 ,
 
 315 N.C. at 232
 
 ,
 
 337 S.E.2d at 493
 
 . The traditional doctrine tended to place an unwarranted burden on the State in certain instances such as attempt crimes, which do not have a "tangible
 
 corpus
 
 [.]"
 
 Id.
 
 at 232,
 
 337 S.E.2d at 493
 
 (citation omitted). The second reason pertains to the development of "modern procedural safeguards[,]" Reeve,
 
 supra
 
 at 1296, that render
 
 corpus delicti
 
 unnecessary to alleviate "the concern that the defendant's confession might have been coerced or induced by abusive police tactics[.]"
 
 Parker
 
 ,
 
 315 N.C. at 234
 
 ,
 
 337 S.E.2d at 494
 
 . Concerns surrounding the validity of an extra-judicial confession "have been undercut by the principles enunciated in
 
 Miranda v. Arizona,
 

 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 [ (1966) ] ... and the development of similar doctrines relating to the voluntariness of confessions which limit the opportunity for overzealous law enforcement."
 
 Id.
 
 at 234,
 
 337 S.E.2d at 494
 
 . Finally, Justice Billings opined the trustworthiness doctrine operates as a more realistic and "flexible" standard for the State when interviewing a defendant and gathering evidence against him.
 
 Id.
 
 at 235,
 
 337 S.E.2d at 494
 
 (citation omitted).
 

 Relying on these justifications, the
 
 Parker
 
 Court held:
 

 We adopt a rule in non-capital cases that when the State relies upon the defendant's confession to obtain a conviction, it is no longer necessary that there be independent
 
 *822
 
 proof tending to establish the
 
 corpus delicti
 
 of the crime charged if the accused's confession is supported by substantial independent evidence tending to establish its trustworthiness, including facts that tend to show the defendant had the opportunity to commit the crime.
 

 Id.
 
 at 236,
 
 337 S.E.2d at 495
 
 . The Supreme Court emphasized, however, "when independent proof of loss is lacking, there must be
 
 strong
 
 corroboration of
 
 essential
 
 facts and circumstances embraced in the defendant's confession. Corroboration of insignificant facts or those unrelated to the commission of the crime will not suffice."
 
 Id.
 
 at 236,
 
 337 S.E.2d at 495
 
 .
 

 Parker
 
 did not wholly demolish the traditional
 
 corpus delicti
 
 rule, however. In 2013, the North Carolina Supreme Court clarified, "we did not abandon the traditional rule when we adopted the rule in
 
 Parker
 
 . Rather, the State may now satisfy the
 
 corpus delicti
 
 rule under the traditional formulation or under the
 
 Parker
 
 formulation."
 
 State v. Cox
 
 ,
 
 367 N.C. 147
 
 , 153,
 
 749 S.E.2d 271
 
 , 276 (2013) (citations omitted).
 

 In Defendant's brief, his primary argument is because he was convicted of felony
 
 *323
 
 murder based on the underlying felony of robbery with a dangerous weapon (rather than based on premeditation and deliberation), under the
 
 corpus delicti
 
 doctrine, the State was required-but failed-to introduce other evidence corroborating the assertion that he stole $104 from the victim. Defendant's argument is his motion to dismiss should be granted because there is not a scintilla of evidence that Defendant took $104 from the victim and therefore a jury would lack the substantial evidence required to support a reasonable inference of Defendant's guilt. Defendant's argument, if adopted, would require non-confessional evidence of every element of a crime to be submitted to the jury. We are not persuaded by this argument.
 

 Under the trustworthiness doctrine, the State does not need independent evidence of each element of the crime to show Defendant's confession to robbery with a dangerous weapon was trustworthy. Our Supreme Court in
 
 Parker
 
 , rejected a similar argument. The State need only show "corroborative evidence tending to establish the reliability of the confession"-not the reliability of each part of the confession which incriminates the defendant.
 

 In
 
 Parker
 
 , the defendant admitted he murdered the victims and then took $10.00 from one of their pockets.
 
 Parker
 
 ,
 
 315 N.C. at 237
 
 ,
 
 337 S.E.2d at 495-96
 
 . The Supreme Court held this confession sufficiently trustworthy because: (1) the bodies were found by police in the condition
 
 *823
 
 described by the defendant; (2) the blood found in the victim's car was consistent with both of the victims' blood; and (3) the evidence was consistent with defendant's statement as to how he disposed of the bodies.
 
 Id.
 
 at 237,
 
 337 S.E.2d at 496
 
 .
 

 Defendant's confession closely parallels that in
 
 Parker
 
 :
 

 I told him to take me to Benson and uh, before we got to Benson, I told him I needed to get out and pee and when I got out, I acted like I peed, pulled a gun out of my pants, opened my door back up and shot him in the head.
 

 ....
 

 Yeah, I did rob him. I got $104.00 off him.
 

 To corroborate Defendant's testimony, the State presented the same "quantum and quantity," of evidence as it did in
 
 Parker
 

 .
 

 Smith
 
 ,
 
 362 N.C. at 592
 
 ,
 
 669 S.E.2d at 306
 
 . The following evidence aligns with Defendant's confession: (1) the medical examiner's determination Billy died from a single gunshot wound to the head; (2) the recovery of a revolver with a single expended cartridge at the scene; (3) the DNA test confirming Billy's blood was inside the 2005 Chevy Malibu; and (4) the DNA test establishing Billy's blood was on the jacket Defendant wore at the time of arrest.
 

 Moreover, the State presented evidence to corroborate other facts. For example, Defendant confessed that he threw Billy's gun out of the car window and tossed the gun behind Billy, which aligns with Dale discovering Billy's revolver missing, and Deputy Burakowski seeing a revolver ten feet from Billy's body. Similarly, Dale reported a 2005 gold Chevy Malibu missing from Billy's used car lot, and detectives found it at a remote location matching Defendant's description of where he abandoned the gold 2005 Chevy Malibu he took from Billy's house.
 
 [8]
 
 All of Defendant's statements regarding Billy's murder, the murder weapon, and the stolen vehicle are essential facts to Billy's confession. Thus, the State provided substantial "independent evidence tending to establish" the trustworthiness of these essential facts, "including [evidence] that tend[s] to show the defendant had the opportunity to commit the crime[s,]" to which he confessed.
 
 Parker
 
 ,
 
 315 N.C. at 236
 
 ,
 
 337 S.E.2d at 495
 
 . Thus, we conclude Defendant's admission he stole $104.00 from
 
 *824
 
 Billy is credible, and the
 
 corpus delicti
 
 for robbery with a dangerous weapon is established.
 

 We hold the trial court did not err in denying Defendant's motion to dismiss the charge of robbery with a dangerous weapon and overrule his assignment of error.
 

 *324
 

 B. Motions to Suppress
 

 Defendant next contends the trial court erred by denying his motions to suppress his in-custody statement and evidence from his seized clothing and DNA test. Here, and at the 12 October 2015 suppression hearing, Defendant does not address his original argument regarding his inability to "knowingly and intelligently" waive his
 
 Miranda
 
 rights. Rather, on appeal, Defendant's argument is two-fold: (1) Findings of Fact Numbers 2, 10, and 11 are not supported by substantial evidence; and (2) detectives arrested him without probable cause, and, therefore, his statement and the evidence gathered from it are "fruits of the poisonous tree." We disagree and address Defendant's arguments in turn.
 

 i. Finding of Fact Number 2
 

 Defendant contends the last sentence in Finding of Fact Number 2 is not supported by substantial evidence and should be stricken from the record. We disagree.
 

 The particular sentence to which Defendant objects states, "The patrol deputy had located a Smith and Wesson revolver
 
 near the decedent
 
 ." (emphasis added) Defendant takes issue with the finding's description of where Deputy Burakowski found the gun at the scene. The trial court sustained Defendant's numerous objections to Detective Byrd's testimony regarding what Deputy Burakowski told him about the location of the gun at the scene. However, at one point the trial court directly questioned Deputy Burakowski about the location of the gun at the scene:
 

 THE COURT: Where and when was the revolver recovered and by whom?
 

 THE WITNESS: It was on the same day, 12/16/2013. It should have been a short time. Recovered by Deputy Burakowski who located the revolver on the scene of the deceased, Mr. Strickland, at which time he secured it in his vehicle. And that was-he arrived on the scene at approximately at 11:49. Due to the EMS workers and fire personnel who arrived on the scene, he secured it in his vehicle for safety reasons.
 

 *825
 
 We note Defendant did not object to this portion of testimony. From this portion of Deputy Burakowski's testimony, we conclude Finding of Fact 2 is by supported by substantial evidence. Moreover, we note even if Detective Byrd's statement does not support Finding of Fact Number 2, the portion contested by Defendant is inconsequential to our holding.
 

 ii. Findings of Fact Numbers 10 and 11
 

 Defendant argues Findings of Fact Numbers 10 and 11 are not supported by substantial evidence.
 

 These Findings state:
 

 10. Dale Strickland told Detective Byrd that the defendant had spent the previous night at the residence. He stated that Defendant had slept on the couch. He further stated that when he woke up, both the defendant and the victim were gone. He stated that his father's Smith and Wesson revolver also was missing and that a Malibu Chevrolet automobile was gone from his father's used car lot at the residence.
 

 11. At about 6:30 p.m., Johnston Sheriff's Detective Kevin Massengill interviewed Carl Dean Temple, an associate of the defendant, at Temple's residence located at 736 Temple Road in Four Oaks. Temple stated that defendant had come to this residence earlier that day driving a tan colored Chevrolet Malibu automobile.
 

 Specifically, Defendant takes issue with the portion of Finding of Fact Number 10: "Dale Strickland ... stated that his father's Smith and Wesson revolver also was missing...." Defendant points out Dale Strickland never told Detective Byrd the manufacturer of his father's firearm. We agree with Defendant.
 

 This portion of the finding is not supported by substantial evidence. Accordingly, we strike this portion of the finding. However, we conclude this error is not prejudicial in light of the following facts: (1) Dale specified to Detective Byrd his father's ".38 revolver was missing[;]" (2) Dale specified to Detective Byrd "[h]is dad's ....38 special gun was gone[;]" and (3) Dale's description of his father's missing gun matched that of the gun found at the scene of Billy's body. The
 
 *325
 
 record shows a connection between Billy's missing gun and the gun found at the scene exists. Therefore, whether or not Dale identified the manufacturer of his father's missing gun to Detective Byrd is irrelevant to our holding.
 
 *826
 
 Regarding Finding of Fact Number 11, Defendant objects to the last sentence, which states, "Temple stated that defendant had come to this residence earlier that day driving a tan colored Chevrolet Malibu automobile." Defendant notes Detective Massengill actually testified Temple did not convey the make or model of the car he saw Defendant driving. We agree the portion of the finding Defendant contests is not supported by substantial evidence.
 

 However, we conclude the error did not prejudice Defendant because: (1) detectives knew Defendant stayed the night at Billy's house where the used cars were stored; (2) detectives knew someone removed a 2005 gold Chevy Malibu from Billy's yard; and (3) detectives knew Temple saw Defendant in a car matching the general description of the car missing from Billy's lot. Regardless of whether Temple relayed the make and model of the car Defendant drove that day, our holding remains the same. Therefore, we strike the portion of Finding of Fact Number 11, which states the make and model of the car Temple saw, but hold it is irrelevant to the trial court's conclusions of law.
 

 iii. Conclusion of Law
 

 We must now determine whether the remaining portions of Findings of Fact Numbers 2, 10, and 11 and the other findings support the trial court's Conclusion of Law Number 1.
 

 The Fourth Amendment protects "against unreasonable searches and seizures...." U.S. Const. amend. IV ; N.C. Const. art. I, § 20. Under North Carolina law, "[a]n officer may arrest without a warrant any person who the officer has probable cause to believe ... [h]as committed a felony...." N.C. Gen. Stat. § 15A-401(b)(2) a (2016). "The existence of probable cause depends upon 'whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' "
 
 State v. Milien
 
 ,
 
 144 N.C.App. 335
 
 , 341,
 
 548 S.E.2d 768
 
 , 772 (2001) (quoting
 
 State v. Bright
 
 ,
 
 301 N.C. 243
 
 , 255,
 
 271 S.E.2d 368
 
 , 376 (1980) (alterations in original). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."
 
 State v. Teate,
 

 180 N.C.App. 601
 
 , 606-07,
 
 638 S.E.2d 29
 
 , 33 (2006) (citation and quotation marks omitted).
 

 The conclusion states:
 

 Under the totality of circumstances believed to exist by the Johnston County Sheriff's Detectives-including the
 
 *827
 
 fact that Defendant placed a telephone call using the victim's cell phone about 20 minutes before the victim's death was reported to the Johnston County Sheriff's Office, the fact that Defendant had spent the previous night at the victim's residence, the fact that the victim's son had last seen his father with the defendant, the fact that the victim's Smith and Wesson revolver was missing that morning and a Smith and Wesson revolver was found near the victim's body, the fact that the Defendant was seen on the day of the victim's death driving an automobile matching the description of an automobile missing from the victim's used car lot, and the fact that Defendant had called Danny Stanley the day of the victim's death looking for a place to stay-probable cause existed for the detectives to seize Defendant's person and take him into custody for the murder of Billy Strickland.
 

 The remaining findings of fact reveal Defendant spent the evening prior to Billy's death at Billy's home, and when Dale awoke the next morning, both Defendant and Billy were gone. Dale noticed Billy's revolver missing from its usual hiding place, and a Chevy Malibu was missing from Billy's used car lot. The trial court found Detectives recovered a revolver matching the description of Billy's gun at the scene.
 

 *326
 
 The trial court further found Temple told detectives Defendant placed a call from Billy's cell phone about twenty minutes before law enforcement received word of Billy's body on the side of Hannah Creek Road. Temple also told detectives he saw Defendant driving a vehicle the color of the Malibu missing from Billy's lot.
 

 These findings suggest the "probability or substantial chance" Defendant engaged in criminal activity.
 
 Teate
 
 ,
 
 180 N.C.App. at 606-07
 
 ,
 
 638 S.E.2d at 33
 
 (citation omitted). Therefore, we hold the court did not err in concluding detectives had probable cause to arrest Defendant. Thus, detectives did not unconstitutionally interview Defendant, or seize his clothing and DNA, and the trial court did not err in denying his motions to suppress.
 

 IV. Conclusion
 

 For the reasons stated above, we find no error.
 

 NO ERROR.
 

 Judges DAVIS and MURPHY concur.
 

 [1]
 

 Defendant filed other pretrial motions, such as a motion
 
 in limine
 
 and a motion for mistrial. However, the only relevant motions on appeal are the motion to dismiss and the three above-mentioned motions to suppress.
 

 [2]
 

 The State actually called emergency dispatcher, Travis Johnson, who received the 911 call, before James Dorman. His testimony is not dispositive to the issues on appeal in this case.
 

 [3]
 

 James's wife, Kimberly Dorman, also testified on behalf of the State. Her testimony matched her husband's.
 

 [4]
 

 The State called two witnesses before Dale, Billy's elder son, Chris Strickland, and Detective Jamie Snipes, who transported Defendant to the Johnston County Sheriff's Office on the evening of 16 December 2013. Their testimony is not dispositive to the issues on appeal.
 

 [5]
 

 The State then called Captain Caldwell of the Johnston County Sheriff's Office. Captain Caldwell also helped locate the missing Malibu and his testimony regarding how and where detectives found the car matches Detective Massengill's. Further, after finding the vehicle, he waited until a local towing company came to transport the car back to Johnston County.
 

 [6]
 

 Ron Mazur, a Johnston County crime scene investigator testified just before Jennifer. However, his testimony consisted of generally proper evidence tagging and transporting procedures and is not dispositive to this appeal.
 

 [7]
 

 At trial, Defendant questioned Langdon extensively regarding how she obtained, boxed, transported, and stored each item of evidence. However, that testimony is not dispositive to this appeal, as Defendant did not challenge the status of any evidence against him.
 

 [8]
 

 The State's brief contained even more evidence corroborating various facts from Defendant's confession in several ways. However, review of additional corroboration is not necessary to our holding.