IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-453

No. COA20-320

Filed 7 September 2021

Wilkes County, No. 16 CVD 1488

DANIEL S. ISOM, Plaintiff,

v.

JANEE A. DUNCAN, Defendant.

Appeal by Defendant from order entered 28 May 2019 by Judge Robert J. Crumpton in Wilkes County District Court. Heard in the Court of Appeals 13 April 2021.

*Tharrington Smith, L.L.P., by Steve Mansbery, for plaintiff-appellee.*

*Anné C. Wright for defendant-appellant.*

MURPHY, Judge.

¶ 1 We review custody orders to ensure the findings of fact are supported by substantial evidence, and the conclusions of law are supported by the findings of fact. When a finding of fact is unchallenged, it is binding on appeal. Here, the trial court did not err in concluding that prohibiting the mother from exercising visitation with the minor child is in the minor child's best interests because this conclusion is supported by the findings of fact that are supported by substantial evidence in the Record.

## BACKGROUND

¶ 2 The minor child, Paula,[1] was born on 28 January 2011 to Mother Defendant-Appellant Janee A. Duncan ("Mother") and Father Plaintiff-Appellee Daniel S. Isom ("Father"). Father and Mother were involved in a romantic relationship before Paula's birth while they were college students in Tennessee but were never married. The couple broke up before Paula was born. Father did not meet Paula until September 2016, when she was five-and-a-half years old, due to Mother hiding Paula from Father and intentionally evading court orders.

¶ 3 The parties' custody battle began in January 2012, when the Hamilton County Superior Court in Indiana ("Indiana Court") entered its *Order Establishing Paternity, Parenting Time, Custody and Support* ("January 2012 Order"). The Indiana Court awarded joint legal custody of Paula to Mother and Father and ordered physical custody to be with Mother. Father was awarded parenting time with Paula pursuant to Indiana Parenting Time Guidelines. When Mother refused to grant Father visitation time with Paula, the Indiana Court entered an order on 5 March 2012 requiring Mother to appear and show cause for her failure to comply with the January 2012 Order. On 31 May 2012, Mother failed to appear at the show cause hearing and,

---

[1] A pseudonym is used for the minor child throughout this opinion to protect the identity of the juvenile and for ease of reading.

as a result, the Indiana Court issued a *Court Order of Contempt and Writ of Body Attachment* ("May 2012 Order").

¶ 4 For approximately the next four years, Father and his family searched for Mother and Paula and were unsuccessful in locating their whereabouts. Father filed a verified emergency motion for physical custody and motion to appoint a guardian ad litem, which the Indiana Court granted in an order filed 6 September 2016 ("Indiana September 2016 Order"). In the Indiana September 2016 Order, Father was immediately granted temporary physical custody of Paula. Around the same time Father was granted temporary physical custody of Paula, Mother fled with Paula to Ohio, where she stayed with an acquaintance, Jessica Webb. Mother told Webb she "needed a place to stay because the [S]heriff in Hamilton County, Indiana came to her house looking for her and [Paula]." After witnessing Mother's behaviors, such as using a "burner phone," researching fake passports, and making Paula use fake names in public, Webb became seriously concerned for Paula's welfare and decided to contact authorities in Indiana and Ohio.

¶ 5 On 22 September 2016, the Ohio Court of Common Pleas in Washington County filed an order ("Ohio September 2016 Order") finding Mother "appears to be a flight risk" and ordering temporary custody of Paula to the Washington County

(Ohio) Children Services Board ("Ohio CPS").[2]  Father, having moved back to North Carolina, filed a lawsuit in Wilkes County District Court on 13 October 2016 for custody of Paula and, on the same day, the trial court entered a *Temporary Order* ("October 2016 Order") awarding Father temporary sole legal and physical custody of Paula, subject to Ohio CPS completing an investigation.

On 31 January 2017, the trial court filed an *Interim Order* ("January 2017 Order") awarding Father temporary legal and physical custody of Paula and awarding Mother limited supervised visitation for four hours on the second weekend of every month and scheduled phone and video calls with Paula.  On 13 October 2017, Mother's visitation was adjusted to a minimum of one hour per week in the trial court's *Temporary Custody Order* ("October 2017 Order"), which found:

> [Mother's] actions show that she willfully and intentionally kept [Paula] from [Father]. [Mother] willfully and intentionally attempted to avoid the jurisdiction of the Indiana Courts. [Mother's] explanations for missing Court, moving, not receiving notices, discrepancies in affidavits and testimony and using false names are wholly unbelievable.  Her actions were a conscious effort to keep [Father] from [Paula] and were without excuse.  [Mother] ignored the authority of the Courts in Indiana.  She moved

---

[2] At this point in September 2016, both the Ohio and Indiana courts had been involved in the custody dispute and a jurisdictional issue arose that is not at issue in this appeal. Ultimately, North Carolina acquired jurisdiction in accordance with a *Jurisdictional Order* filed in Wilkes County District Court on 25 September 2017, recognizing "Wilkes County Civil District Court has personal and subject matter jurisdiction in these causes, and has authority to enter such Orders as may be necessary regarding modification of custody, child support, or otherwise regarding the minor child, [Paula]."

> to Ohio in an attempt to avoid the Court. She had [Paula] use false names to help avoid the Court. [The trial court] has no assurances that [Mother] would follow the Orders of [the trial court] if given unsupervised visitations. [Mother] argues that she has submitted to [the trial court's] jurisdiction and realizes that if she left the State in violation of an Order of [the trial court] that she could be charged with a felony and arrested. However, the Court in Indiana issued at least two separate orders for her arrest and she avoided law enforcement and the Court for 5 years.

¶ 7 Beginning in February 2017, Mother participated in supervised visits with Paula at SonShine Child Care Center, Incorporated ("SonShine Child Care") and Our House in Wilkesboro. A visitation supervisor indicated that while most visits with Mother and Paula were "appropriate," Mother violated the Our House guidelines by pulling out a camera phone and taking a photograph of a bruise on Paula. Similarly, there was an incident on 31 July 2018 at SonShine Child Care where Mother violated the facility guidelines when she let an off-duty police officer into the facility despite warnings from the staff. In August 2018, Father filed a motion to suspend or terminate Mother's visitation.

¶ 8 The trial court filed an *Order* on 28 May 2019 ("May 2019 Order"). The May 2019 Order decreed "[Father] shall have and exercise the sole legal and physical, custody, care and control of [Paula]"; "[Mother] shall not have any visitation with [Paula], but she shall be entitled to have phone call or Facetime video call contact with [Paula] one time per week each Saturday for 10 minutes [and] . . . a similar call

for the same time on each Christmas, Thanksgiving, Easter and birthday of [Paula]." Mother timely appealed from the May 2019 Order.

## ANALYSIS

The ultimate issue on appeal is whether the trial court erred in denying visitation between Mother and Paula. "It is a long-standing rule that the trial court is vested with broad discretion in cases involving child custody[,]" *Pulliam v. Smith*, 348 N.C. 616, 624, 501 S.E.2d 898, 902 (1998), and therefore, "[w]e review an order denying visitation for abuse of discretion." *In re J.R.S.,* 258 N.C. App. 612, 616, 813 S.E.2d 283, 286 (2018). The reason for an abuse of discretion standard of review is because the trial court "has the opportunity to see the parties in person and to hear the witnesses . . . . The trial court can detect tenors, tones, and flavors that are lost in the bare printed record read months later by appellate judges." *Scoggin v. Scoggin*, 250 N.C. App. 115, 118, 791 S.E.2d 524, 527 (2016) (marks omitted). The trial court's decision will be "reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

Further, "[i]n a child custody case, the trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings." *Peters v. Pennington*, 210 N.C. App. 1, 12-13, 707 S.E.2d 724, 733 (2011). "Substantial evidence is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Mitchell v. Mitchell*, 199 N.C. App. 392, 405, 681 S.E.2d 520, 529 (2009). "Unchallenged findings of fact are binding on appeal. Whether the trial court's findings of fact support its conclusions of law is reviewable *de novo*. If the trial court's uncontested findings of fact support its conclusions of law, we must affirm the trial court's order." *Scoggin*, 250 N.C. App. at 118, 791 S.E.2d at 526 (marks omitted).

¶ 11 Mother's ultimate argument on appeal is "[t]he trial court erred in denying visitation between [Paula] and her mother." We disagree with Mother's contentions, especially in light of Finding of Fact 36.

## A. Challenged Findings of Fact

¶ 12 On appeal, Mother challenges Findings of Fact 6, 15, 22, 23, 25, 27, 37, 38, and 39, as well as Conclusion of Law 4. Specifically, Mother contends Findings of Fact 23, 25, and 27 are not supported by the evidence in the Record. Mother also mentions Findings of Fact 15, 22, 37, and 38 in her brief, but does not argue these findings are unsupported by the evidence.

### 1. Findings of Fact Challenged as Unsupported by the Evidence

¶ 13 Finding of Fact 23 states:

> 23. Once [Paula] was safely returned to the care of [Father] in North Carolina, [Mother] did not initially exercise visits. Eventually, supervised visitation was set up through SonShine Child Care and Our House in Wilkesboro as described in the Temporary and Interim Orders in this

cause. Visits at both locations became problematic due to [Mother's] behavior and complaints at each location. Neither facility will agree to supervise visits any longer in this case.

Mother only challenges the first sentence of Finding of Fact 23–"[o]nce [Paula] was safely returned to the care of [Father] in North Carolina, [Mother] did not initially exercise visits." Mother argues she "had no visitation rights to exercise until the entry of the trial court's [January 2017 Order] on 31 January 2017 as the trial court's [October 2016 Order] did not provide for any visitation rights."

¶ 14 The Record reflects Mother was first granted temporary supervised visitation in the January 2017 Order. Mother testified she began supervised visits at Our House in February 2017. The January 2017 Order was entered on 31 January 2017 and, while it is unclear when exactly in February the visits began, it is clear from the Record Mother initially exercised her visitation with Paula immediately. The challenged sentence of Finding of Fact 23 is unsupported by the evidence, and the trial court erred by making this finding. We strike the portion of Finding of Fact 23 that states: "Once [Paula] was safely returned to the care of [Father] in North Carolina, [Mother] did not initially exercise visits." *See State v. Messer*, 255 N.C. App. 812, 825, 806 S.E.2d 315, 324 (2017) ("This portion of the finding is not supported by substantial evidence. Accordingly, we strike this portion of the finding.").

¶ 15    However, striking this portion of Finding of Fact 23 does not affect the sufficiency of the remaining supported findings of fact to support the trial court's conclusion of law. Omitting this portion of the finding, the trial court's conclusion of law that "[i]t is not in [Paula's] best welfare and interests that [Mother] exercise any visitation" is still supported by the remaining abundant and detailed findings of fact, which are supported by substantial evidence as discussed in further detail below. *See In re E.M.*, 249 N.C. App. 44, 49, 790 S.E.2d 863, 869 (2016) ("[T]he inclusion of an erroneous finding of fact is not reversible error where the [trial] court's other factual findings support its determination.").

¶ 16    Finding of Fact 25 states, in pertinent part:

> 25. Likewise, Tracy Lowder, the Director of SonShine Child Care, also testified at [the] hearing. Mrs. Lowder indicated that although [Mother] was supplied with the Rules for the facility, [Mother] refused to sign them. Mrs. Lowder also testified that although [Mother] was appropriate for most visits, there were several times when [Mother] had to be cautioned regarding rule violations, including bringing other persons into the facility who were not supposed to be part of the visit, whispering to [Paula], taking photographs, and becoming belligerent with staff. *Eventually, visits at this location were also terminated due to [Mother's] behavior.*

(Emphasis added).[3] In challenging Finding of Fact 25, Mother argues visits at SonShine Child Care "stopped after [Mother] moved to North Carolina because the visits then became weekly and could all be accommodated by Our House."

¶ 17  Although visits may have stopped at SonShine Child Care because they became weekly and could all be accommodated by Our House, there is substantial evidence in the Record to support the finding that visits at SonShine Child Care were "*also* terminated due to [Mother's] behavior." (Emphasis added). Tracy Lowder, the Director of SonShine Child Care, testified as follows:

> [FATHER'S COUNSEL:] All right. So . . . is it the intention of SonShine [Child Care] to offer any further visitation --
>
> [LOWDER:] No.
>
> [FATHER'S COUNSEL:] -- at those premises?
>
> [LOWDER:] No, sir.
>
> [FATHER'S COUNSEL:] Okay. At least not to [Mother]?
>
> [LOWDER:] Right.
>
> [FATHER'S COUNSEL:] And you indicated several things. Was the fact that she let a visitor into the premises, is that a violation of your policy?
>
> [LOWDER:] Yes, it's a huge violation. She's let a visitor in before, but I was able to contain that visitor in a locked portion of the building. This visitor came into the supervised area portion of the building which is not

---

[3] Mother only challenges the portion of Finding of Fact 25 that states: "Eventually, visits at this location were also terminated due to [Mother's] behavior."

allowed. I have no way of watching two people at the same time. I had to keep my back to this visitor, and I was very uncomfortable having her stand behind me the whole time.

[FATHER'S COUNSEL:] In addition to that, what about the discussion and saying things like [Father] is a rapist, [Father is] a violent abuser, is [Mother] saying those sorts of things in front of [Paula]?

[LOWDER:] Yes, she was saying those where [Paula] could hear what was being said.

[FATHER'S COUNSEL:] Is that also a violation of your policies?

[LOWDER:] It is.

[FATHER'S COUNSEL:] *And for those reasons alone you would not allow her back*?

[LOWDER:] *Exactly*. Some of the violations that she's had in the past like not volunteering her keys, the cell phone, those are minor and they're not going to harm [Paula]. But this attack on a parent, that is very psychologically harmful, and so that is something that we can't tolerate.

[FATHER'S COUNSEL:] Were you concerned at any point that [Mother] was trying to flee the premises with [Paula]?

[LOWDER:] Yes. By letting a visitor into the building, she had no idea that there is another person in the building that could assist me with the visitation until she arrived. So letting that other person in there was a huge violation and was definitely something that I was very concerned with. It would have been easy for the two of them to take [Paula] out of the premises if I had been by myself.

(Emphases added). This testimony explicitly states Mother was not allowed to

continue visitation at SonShine Child Care because of her behavior and violations of

the facility's rules. While the trial court's timeline implied by Finding of Fact 25 is incorrect, it does not impact the validity of the finding of fact that visits were ultimately terminated because of Mother's behavior.

¶ 18 To the extent that Finding of Fact 25 suggests the initial cessation of visitation at SonShine Child Care was due to Mother's behavior, the finding of fact is unsupported by evidence in the Record. However, there is substantial evidence in the Record to support the trial court's finding that "*[e]ventually*, visits at [SonShine Child Care] were *also* terminated due to [Mother's] behavior." (Emphases added). Finding of Fact 25 is binding on appeal.

¶ 19 Finding of Fact 27 states:

> 27. Two local Wilkesboro police officers investigated the [31 July 2018] incident and allowed [Paula] to be released into the custody of [Father], despite the strong protests of [Mother], who made the statement: *"I am not leaving Wilkes County tonight without my child."* [Mother] then insisted that Wilkes DSS be called, and the officers did so.

(Emphasis added). The 31 July 2018 incident referred to in Finding of Fact 27 is detailed in Findings of Fact 25 and 26:

> 25. . . . . The last visit at SonShine [Child Care] occurred on [31 July 2018]. Just prior to that visit, [Father] had gotten married and traveled with his new wife out of town on their honeymoon. [Mother] knew [Father] had left for his honeymoon . . . . Unbeknownst to SonShine [Child Care] staff, [Mother] had hired an off-duty, Hickory police officer . . . to show up toward the end of the visit on [31 July 2018]. Near the end of the visit, [Mother] saw a very small faint

bruise on [Paula] . . . and insisted on lifting up [Paula's] shirt and taking a photograph. [Lowder] objected and told [Mother] that this was against the Rules of the facility. [Mother] persisted so much that [Paula] became very upset, "shut down," and started hiding under the table.

26. The circumstances of the [31 July 2018] visit was [sic] recorded by SonShine [Child Care] security cameras. . . . Toward the end of the visit, [Mother] began texting [the off-duty police officer] several times, urging her to come to the facility. [Mother] then exited the visitation room and began going to different doors in an effort to let [the off-duty police officer] into the facility, which was also against the rules. [Lowder] cautioned [Mother] several times to stop this behavior and to not let anyone in, but [Mother] ignored her and proceeded to let [the off-duty police officer] come in. [Paula] exited the visitation room, came into the hallway, and was near the side doorway when [Lowder] grabbed her hand and ushered her back into the room. [Lowder] was fearful that [Mother] was trying to remove [Paula] from the facility. At this point, [Lowder] felt that things were getting out of hand and contacted [Father's] family. [The off-duty police officer] had by that time called the local Wilkesboro police department. Authorities arrived, as did [Father] and his family. During this time, [Mother] was making negative comments about [Father] within the hearing of [Paula], which is also against SonShine [Child Care] rules. [Lowder] read her own Affidavit . . . into evidence at the hearing, and the [trial court] incorporates the same by reference into these findings of fact.

Mother argues there is no evidence that she made the statement "I am not leaving Wilkes County tonight without my child."

Mother testified to the following:

> [FATHER'S COUNSEL:] Well, you made the statement that night that, "I'm not leaving Wilkes County without my

daughter"?  You made that statement, didn't you?

[MOTHER:] Sir, I have that recorded, and I did not make that statement at any point in time.

Father argues that because the trial court found Mother's testimony to be not credible, the trial court can draw the inference that Mother was lying when she testified that she did not make the statement, "I'm not leaving Wilkes County without my daughter."  Father's argument does not correctly state the law.

¶ 22        "It is well settled that questions asked by an attorney are not evidence. Similarly, a question in which counsel assumes or insinuates a fact not in evidence, and which receives a negative answer, is not evidence of any kind."  *State v. Richardson*, 226 N.C. App. 292, 303, 741 S.E.2d 434, 442 (2013) (marks and citations omitted).  As a result of the fact that Mother denied saying the statement "I'm not leaving Wilkes County without my daughter[,]" the Record contains no evidence that Mother made the statement "I am not leaving Wilkes County tonight without my child" from Finding of Fact 27.

¶ 23        The portion of Finding of Fact 27 that states Mother "made the statement: 'I am not leaving Wilkes County tonight without my child'" is not supported by evidence in the Record.  However, this portion of Finding of Fact 27 is not essential to the ultimate issue on appeal.  *See In re A.Y.*, 225 N.C. App. 29, 41, 737 S.E.2d 160, 167 ("We agree that this [portion of the] finding of fact is [not] supported by competent

evidence. . . . This error is, however, harmless."), *disc. rev. denied*, 367 N.C. 235, 748 S.E.2d 539 (2013).

**2. Other Challenged Findings of Fact**

Mother also challenges Findings of Fact 15, 22, 37, and 38, but does not argue these findings are unsupported by evidence in the Record. Rather, Mother appears to argue the trial court erred in using these findings to support its ultimate conclusion that "[i]t is not in [Paula's] best welfare and interests that [Mother] exercise any visitation." "A party abandons a factual [argument] when she fails to argue specifically in her brief that the contested finding of fact was unsupported by the evidence." *Peters*, 210 N.C. App. at 16, 707 S.E.2d at 735. Consequently, Findings of Fact 15, 22, 37, and 38 are binding on appeal. Nevertheless, we address each of these findings of fact, and Mother's corresponding argument in her brief, in sequential order and conclude they are supported by substantial evidence.

Finding of Fact 15 states:

> 15. [Mother] began making various statements to and in front of [Webb] which began to alarm [Webb]. For instance, [Mother] said several times, and in a serious manner, that she regretted not inviting [Father] to her house under the pretense of discussing custody, and then killing him and making it look like self-defense. [Mother] also admitted to [Webb] that she had a gun. [Mother] told [Webb] that she "understood how moms could kill their children." [Mother] confided to [Webb] that she was "desperate," and wanted to just drown in the river and die so that she would not have to deal with these problems. She described wanting to

"float away with [Paula] to be with God." [Webb] interpreted these to be suicidal and homicidal ideations. [Webb] became increasingly alarmed about [Mother's] mental health.

¶ 26    Finding of Fact 22 states:

> 22. The [trial court] finds that at the time of [Paula's] recovery in Ohio, [Mother] was actively researching for ways to flee the United States by use of fake passports and ID's for herself and [Paula]. This is very troublesome for the [trial court] since [Mother] had already demonstrated a proclivity and ability to readily avoid court orders, arrest warrants, and hearings during the 5 ½ years that she had [Paula]. Coupled with the fact that [Mother] has contemplated killing [Father], has had access to a gun, and has had homicidal and suicidal thoughts regarding [Paula] and herself, the [trial court] believes [Mother] constitutes a significant on-going flight risk with [Paula], as well as a potential threat of harm to [Paula] and others.

¶ 27    In her brief, Mother addresses Findings of Fact 15 and 22 together:

> Presumably the comments to which the trial court refers [to in Finding of Fact 22] are the one[s] that [Mother] made in 2016 as referenced in [Finding of Fact] number 15. No doubt many divorced, or otherwise estranged parents, have voiced that they would like to kill the other parent of their children or that they wish they would die so they didn't have to deal with a problem. Adults often make such hyperbolic statements to one another. The ones in this case were made several years before the [May 2019 Order] was entered and are not indicative of any actual threat to [Paula].

Mother tries to minimize the impact of these statements on the welfare of Paula.

However, both findings of fact are supported by testimony from Webb that Mother

said to her "*several times, and in a serious manner*, that she regretted" not killing

Father and making it look like self-defense. (Emphasis added). Webb testified to the following:

> [FATHER'S COUNSEL:] Would you please tell us about any observations by you that [Mother] in any manner threatened [Father's] life?
>
> [WEBB:] She expressed on more than one occasion that she regretted not inviting him to her home under the -- with him under the impression that they were going to discuss custody or him meeting [Paula]. And she would ask him to come into the house and provoke a fight and shoot him and kill him.
>
> And she regretted not doing that. Because she felt like now she had to be on the run to avoid him and it would have been much simpler if she could have just killed him.
>
> [FATHER'S COUNSEL:] Okay. So did she describe to you a very real and detailed plan to lure [Father] into her home so she could pretend that there was some type of attack and she would shoot him in self-defense?
>
> [WEBB:] Yes.
>
> [FATHER'S COUNSEL:] How many times during her nine-day stay with you did she mention that plan?
>
> [WEBB:] Three or four.
>
> [FATHER'S COUNSEL:] And how seriously did you take that threat?
>
> [WEBB:] I could tell she was very serious when she said it. She said it very casually.
>
> [FATHER'S COUNSEL:] Like she was unemotional?
>
> [WEBB:] Yes.

[FATHER'S COUNSEL:] And what behaviors did you observe in [Mother] that made you believe [Mother] would follow through with a plan like that?

[WEBB:] During the time that she was at my house, she became increasingly more desperate. And I think that desperate people do desperate things. And she -- I very much believed her when she said she regretted not just what she called, "Doing it the easier way." Which was killing him.

[FATHER'S COUNSEL:] Okay. At this point, were you concerned about the state of [Mother's] mental health?

[WEBB:] Yes.

[FATHER'S COUNSEL:] And you specifically mentioned her shooting [Father]. Were you aware that [Mother] had ever owned a gun?

[WEBB:] Yes. She said that she had a gun in the house.

. . . .

[FATHER'S COUNSEL:] At some point during that nine-day stay with you, did [Mother] make a comment to you that she now understood how mothers can kill their children?

[WEBB:] Yes.

[FATHER'S COUNSEL:] When did she say that?

[WEBB:] It was probably the fifth or sixth day. It was more than halfway through her stay.

[FATHER'S COUNSEL:] And what prompted that statement?

[WEBB:] She was talking to [a friend] and I. [The friend] had come to my house to visit, and we were -- the kids were

in bed and we were on the couch, just talking. And [Mother] was going through different possibilities, "Should I go to Japan? Should I go to Canada? Should I try to get a fake passport?" And every option she would say what complications there would be. "Well, I don't know how to get a fake passport." You know, "I'm going to Google how to do this." And, "I don't know how I would have money to go to Japan."

So every suggestion that -- that [Mother] came up with herself, there was a major problem with. And so she was just getting upset. . . .

. . . .

[FATHER'S COUNSEL:] At that point in time, were you fearful for the safety of [Paula]?

[WEBB:] Yes.

. . . .

[FATHER'S COUNSEL:] Did [Mother] make a comment to you that she wishes that she and [Paula] could just float away to be with God?

[WEBB:] Yes.

[FATHER'S COUNSEL:] How many times did [Mother] say that to you?

[WEBB:] Three or four times.

[FATHER'S COUNSEL:] And what did that mean to you?

[WEBB:] It mean [sic] that she wished they could drown in the river and die and not have to deal with the problems anymore is what she said. And I have a river in my backyard. So obviously that was a little specific for my comfort.

¶ 28 The trial court found in Finding of Fact 11 "the testimony of [Webb] [is] credible. [Webb] had no reason or motivation to lie or be deceptive with the [trial] court." Mother did not challenge this finding of fact and it is therefore binding. *See Scoggin*, 250 N.C. App. at 118, 791 S.E.2d at 526. Webb's testimony is substantial evidence in the Record to support Findings of Fact 15 and 22. These findings are binding on appeal.

¶ 29 Finding of Fact 37 states:

> 37. Due to [Mother's] behaviors, the [trial court] cannot allow unsupervised visitation with [Paula]. The [trial court] finds that if [Mother] has unsupervised visits with [Paula], she will likely flee again with [Paula]. She has shown by her past actions that she will not follow Court orders.

¶ 30 In her brief, Mother addresses Finding of Fact 37 by arguing:

> The trial court found that "if the mother has unsupervised visitation with [Paula], she will likely flee again with [Paula]." After [Paula] came into [Father's] custody, [Mother] moved to North Carolina. She began working fulltime as a First Steps Domestic Violence Case Manager in May 2017 and was still so employed at the time of the hearings at issue. She rented a home which was appropriate and adequately sized. The trial court found that [Mother] evaded service and disobeyed court orders in an attempt to keep [Father] out of [Paula's] life.
>
> Though [Mother] testified, to the contrary that to her knowledge, [Father] never sent any letters, holiday gifts, child support or otherwise showed that he wanted to have anything to do with [Paula], "it is within the trial court's discretion to determine the weight and credibility that

> should be given to all evidence that is presented during the
> trial." *Phelps v. Phelps*, 337 N.C. 344, 357, 446 S.E.2d 17,
> 25 (1994). However, the trial court's concerns regarding
> the possibility that [Mother] would flee with [Paula] are
> adequately addressed by limiting visitation to supervised
> visitation within the home county. *See Brewington v.
> Serrato*, 77 N.C. App. 726, 733, 336 S.E.2d 444, 449
> (1985)[.]

(Record citations omitted). Mother's argument suggests the trial court could have

made a different finding in regard to unsupervised visitation and is asking this Court

to reweigh the evidence in favor of Mother. However, this we cannot do, as our

authority is limited to determining whether the "trial court's findings of fact are . . .

supported by substantial evidence[.]" *Peters*, 210 N.C. App. at 12, 707 S.E.2d at 733.

Findings of fact supported by substantial evidence are conclusive on appeal "even if

there is sufficient evidence to support contrary findings." *Id.* at 12-13, 707 S.E.2d at

733. As Mother acknowledges, it is not for us to reweigh the evidence to determine

what the trial court could have done.

¶ 31 There is substantial evidence in the Record to support Finding of Fact 37. As

discussed above, there is credible testimony in the Record to support Finding of Fact

22, and that finding of fact is binding on us. Finding of Fact 22 states Mother's past

and present actions, including her "proclivity and ability to readily avoid court

orders," her research about fake passports, her access to a gun, and her mental health

constitute an "on-going flight risk with [Paula], as well as a potential threat of harm

to [Paula]." The trial court did not err in finding "the [trial court] cannot allow [Mother to exercise] unsupervised visitation with [Paula]" and "if [Mother] has unsupervised visits with [Paula], she will likely flee again with [Paula]." Finding of Fact 37 is binding on appeal.

¶ 32 Finding of Fact 38 states:

> 38. In a normal situation, the supervisor that [Mother] suggested would be appropriate. However, given [Mother's] actions at Our House and Son Shine Child Care, coupled with her past actions, lead the [trial court] to conclude that it would be impossible for her supervisor to be able to control her and prevent her from fleeing with [Paula].

¶ 33 In her brief, Mother quotes Finding of Fact 38 and argues:

> The supervisor suggested by [Mother] was someone [Mother] knew from church, Lydia. Lydia was a stay-at-home mother with four children, two of whom were adopted. There was no evidence indicating in any way that Lydia was under a disability or suffered from any other condition which would render her unable to alert the authorities if [Mother] tried to flee with [Paula].

(Citations omitted). Again, Mother's argument suggests we should reweigh the evidence in her favor. While the trial court could have pursued a different course of action with regard to who would supervise visitation, it chose not to do so, and we will not disturb that finding of fact as long as there is substantial evidence in the Record to support the finding.

¶ 34        Finding of Fact 38 is supported by substantial evidence in the Record, including unchallenged Findings of Fact 26 and 36. Finding of Fact 26 states:

> 26. . . . . Toward the end of the visit [at SonShine Child Care], [Mother] began texting [an off-duty police officer she hired] several times, urging her to come to the [SonShine Child Care] facility. [Mother] then exited the visitation room and began going to different doors in an effort to let [the off-duty police officer] into the facility, which was also against the rules. [Lowder] cautioned [Mother] several times to stop this behavior and to not let anyone in, but [Mother] ignored her and proceeded to let [the off-duty police officer] come in. [Paula] exited the visitation room, came into the hallway, and was near the side doorway when [Lowder] grabbed her hand and ushered her back into the room. [Lowder] was fearful that [Mother] was trying to remove [Paula] from the facility. At this point, [Lowder] felt that things were getting out of hand and contacted [Father's] family. [The off-duty police officer] had by that time called the local Wilkesboro police department. Authorities arrived, as did [Father] and his family. During this time, [Mother] was making negative comments about [Father] within the hearing of [Paula], which is also against SonShine [Child Care] rules. [Lowder] read her own Affidavit . . . into evidence at the hearing, and the [trial court] incorporates the same by reference into these findings of fact.

Finding of Fact 26 shows that Lowder, a neutral third-party, had a challenging time supervising Mother during her visits with Paula and feared Mother would flee with Paula. Based on this, there was substantial evidence to support the trial court's finding of fact that "it would be impossible for [Mother's] supervisor to be able to control her and prevent her from fleeing with [Paula]."

Finding of Fact 36 also supports Finding of Fact 38. In Finding of Fact 36, the trial court found "[Mother] will not follow the orders of [the trial court]." Even if the trial court were to allow Mother to choose the supervisor for her visits with Paula, this unchallenged finding of fact suggests Mother would not respect and obey the supervisor. There is substantial evidence in the Record to support Finding of Fact 38. This finding of fact is binding on appeal. We now address Mother's challenged conclusions of law.

## B. Challenged Conclusions of Law

Mother challenges Findings of Fact 6 and 39 as at least partial conclusions of law. We agree that portions of Finding of Fact 6 and the entirety of Finding of Fact 39 are more properly labeled as conclusions of law.

> [T]he labels "findings of fact" and "conclusions of law" employed by the lower tribunal in a written order do not determine the nature of our standard of review. . . . [I]f the lower tribunal labels as a finding of fact what is in substance a conclusion of law, we review that "finding" as a conclusion *de novo*.

*In re V.M.*, 273 N.C. App. 294, 298, 848 S.E.2d 530, 534 (2020) (marks and citation omitted). "The classification of a determination as either a finding of fact or a conclusion of law is admittedly difficult. As a general rule, however, any determination requiring the exercise of judgment, or the application of legal

principles, is more properly classified a conclusion of law." *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997) (citations omitted).

¶ 37        Finding of Fact 6 states, in relevant part:

> 6. . . . . [Father] is a loving, fit and suitable custodian for [Paula], and it is in the best interests and welfare of [Paula] that she remain in the permanent, sole, legal and physical, care, custody and control of [Father]. *It is not in [Paula's] best welfare or interests that she have any visitation with [Mother].*

(Emphasis added).

¶ 38        Finding of Fact 39 states:

> 39. Pursuant to [N.C.G.S. §] 50-13.5(i), the [trial court] finds that *it is not in the best interest of [Paula] to allow [Mother] visitation* because of the high probability that [Mother] will remove and secret [Paula] from the jurisdiction of the [trial court].

(Emphasis added).

¶ 39        Both Findings of Fact 6 and 39 conclude it is not in Paula's best welfare and interests that Mother exercise any visitation. In making this determination, the trial court applied legal analysis to the facts and concluded it is not in Paula's best interest to have visitation with Mother. This conclusion required the exercise of judgment and is more properly classified as a conclusion of law, rather than a finding of fact. *See In re J.R.S.,* 258 N.C. App. at 617, 813 S.E.2d at 286 (marks omitted) ("A determination regarding the best interest of a child is a conclusion of law because it

requires the exercise of judgment."); *see also Huml v. Huml*, 264 N.C. App. 376, 400, 826 S.E.2d 532, 548 (2019). As Findings of Fact 6 and 39 are more properly classified as conclusions of law, we review them de novo to determine whether they are supported by the findings of fact.

¶ 40    Mother challenges Findings of Fact 6 and 39 and Conclusion of Law 4 as not being "adequately supported by the competent findings of fact." Similar to Findings of Fact 6 and 39, Conclusion of Law 4 states: "It is not in [Paula's] best welfare and interests that [Mother] exercise any visitation." As Findings of Fact 6 and 39 and Conclusion of Law 4 all make the same conclusion, that it is not in Paula's best interests for Mother to exercise visitation, we address them together.

¶ 41    "We review an order denying visitation for abuse of discretion." *In re J.R.S.*, 258 N.C. App. at 616, 813 S.E.2d at 286; *see Huml*, 264 N.C. App. at 389, 826 S.E.2d at 541-42 ("If we determine that the trial court has properly concluded that the facts show that a substantial change of circumstances has affected the welfare of the minor child and that modification was in the child's best interests, we will defer to the trial court's judgment and not disturb its decision to modify an existing custody agreement."). A trial court may deny visitation to a noncustodial parent if the parent is an unfit person to visit the child or it is in the best interests of the child to deny visitation. *See* N.C.G.S. § 50-13.5(i) (2019) ("[T]he trial judge, prior to denying a parent the right of reasonable visitation, shall make a written finding of fact that the

parent being denied visitation rights is an unfit person to visit the child or that such

visitation rights are not in the best interest of the child.").

> Our courts have long recognized that sometimes, a custody order denying a parent all visitation . . . with a child may be in the child's best interest[.] . . . The welfare of a child is always to be treated as the paramount consideration. Courts are generally reluctant to deny all visitation rights to the divorced parent of a child of tender age, but it is generally agreed that visitation rights should not be permitted to jeopardize a child's welfare.

*Huml,* 264 N.C. App. at 399, 826 S.E.2d at 548; *see also In re Stancil*, 10 N.C. App.

545, 551, 179 S.E.2d 844, 848-49 (1971) (emphasis omitted) ("The rule is well

established in all jurisdictions that the right of access to one's child should not be

denied unless the [trial] court is convinced such visitations are detrimental to the

best interests of the child.").

¶ 42        The trial court's findings of fact support its conclusion in Findings of Fact 6

and 39 and Conclusion of Law 4 that "[i]t is not in [Paula's] best welfare and interests

that [Mother] exercise any visitation."  Findings of Fact 6 and 39 and Conclusion of

Law 4 are supported by ample unchallenged findings of fact in the Record, including

Findings of Fact 7, 9, 10, 11, 12, 13, 14, 16, 21, 33, 34, 34,[4] and 36.  Those unchallenged

findings of fact state:

> 7. [Father] first met [Paula] in September of 2016 at the Washington County Ohio CPS Office after [Paula] was

---

[4] The May 2019 Order contains two findings of fact numbered "34."

recovered by authorities after 5 ½ years with [Mother]. [Father] and his family had searched for 5 ½ years for [Paula] . . . . Prior to September of 2016, [Mother] and her family had denied all contact of [Father] with [Paula] and had actually hidden and secreted [Paula] and [Mother] from [Father] with the logistical and financial aid of [Mother's] family. Pending release to the care of [Father] by Ohio CPS, [Paula] stayed in foster care for a period of time in Ohio while awaiting a decision by the courts. While [Paula] was in Ohio CPS custody, [Mother] stated in a phone call to [Father] on [25 September 2016] that she had received a spiritual epiphany and now suddenly wanted [Father] to be involved in [Paula's] life.

. . . .

9. At the time [Paula] came into the care of [Father], neither a birth certificate nor a social security number had ever been issued for [Paula], even though Indiana law required that a birth certificate be issued within 5 days. [Mother] intentionally refused to have this done for 5 ½ years. [Father] has now obtained both a delayed certificate of birth and social security number for [Paula].

10. Since living with [Father], [Paula] has exhibited no signs of multiple allergies nor needed any treatment for same, even though [Mother] insisted that [Paula] had numerous allergies of all types during the 5 ½ years that she was in [Mother's] care. [Paula's] counselor and doctor testified that these alleged "allergies" were another form of "control" exercised by [Mother] over [Paula]. During [these] 5 ½ years, [Mother] also refused to vaccinate [Paula], or get her dental care, or medical care of any kind. [Mother] only had [Paula] seen by chiropractors and "holistic" practitioners. Although the [trial] court realizes that parents have a right not to immunize their children, [Mother] gave conflicting testimony about why she refused to do so, first stating in her Interrogatory Answers that it was due to egg allergies, and then stating that it was due to her religious beliefs. [Mother] told Ohio DSS that

[Paula] liked to eat eggs. She also told Ohio DSS that [Paula] had numerous food allergies and sensitivities but did not mention an egg allergy . . . . The [trial] court finds that [Mother's] beliefs that [Paula] had numerous allergies were completely unfounded, and that she actually endeavored to keep [Paula] from having medical records in order to help secret the child. Since acquiring custody, [Father] has made sure that [Paula] has received all of her vaccinations, medical check-ups and treatment.

11. The [trial] court heard extensive testimony from [Father's] witness, [Webb], by video deposition. [Webb] is an acquaintance whom [Mother] met in college, but with whom she had no intervening contact for many years. In September of 2016, [Webb] was contacted by a mutual friend named Megan Buskirk, who said that [Mother] and [Paula] needed a place to stay in Ohio. [Mother's] mother, Karen Duncan, then drove [Mother] and [Paula] from Indiana to Ohio late at night on [12 September 2016]. They arrived at the Webb home under cover of darkness and drove straight inside a garage, so they would not be seen. [Karen Duncan] stayed overnight that night, too. This sudden trip to Ohio coincided with a recent "body attachment" and Order for Contempt which had just been issued by the courts in Indiana for [Mother] and [Paula] on [30 August 2016]. [Mother] and [Paula] remained at the Webb home for 9 days, from [12 September] through [21 September 2016]. During this time, [Webb] observed and communicated with [Mother] and [Paula] extensively. The [trial] court finds the testimony of [Webb] to be credible. [Webb] had no reason or motivation to lie or be deceptive with the [trial] court. She received no compensation or reward from [Father] or his family. If [Webb] had been testifying for money, then she would have given [Father] her information and location immediately when she first spoke with him. Instead, she waited and provided this information to [Father's] father.

12. [Mother] told [Webb] that she needed a place to stay

because the [S]heriff in Hamilton County, Indiana came to her house looking for her and [Paula]. [Mother] also confided to [Webb] that she did not want to be found in Indiana. [Mother] told [Webb] that she wanted to keep [Paula] from [Father] because he and his family were "bad people." She regularly referred to them as "the crazies." Karen Duncan had said the same thing to [Webb] the night that Karen stayed at the Webb home. [Mother] told [Webb] that she knew about court in Indiana and the "body attachment," but had no intention of going to Court. She also knew that [Father] and police were looking for her. [Mother] was tense and nervous during her stay at the Webb home. [Webb] did not know at first if what [Mother] was telling her about [Father's] family was true or not. The longer [Mother] stayed, the more [Webb] realized that [Mother] was lying and/or exaggerating. Although [Webb] did not want to be involved, she began to become seriously concerned for the welfare of [Paula] the more she heard from [Mother] and the more she learned on the internet about [Paula's] situation.

13. [Mother] had two cell phones while she was at the Webb home. [Mother] admitted that one of these phones was a "burner phone" which was not traceable. During her stay, [Mother] frequently talked to her lawyer, her mother, and her sister, Tiffany Duncan Midkiff, on these phones. [Mother] also admitted to [Webb] that she wanted to flee the country with [Paula] but could not afford to do so. [Mother] used the internet at [Webb's] home to actively research Japan and Canada and other countries which would not extradite her and [Paula]. [Mother] also researched fake passports for herself and [Paula] and discussed this five or more times with [Webb]. The [trial] court believes this testimony and does not find that [Webb] in any manner initiated or encouraged the idea of fleeing the country with [Paula].

14. During their nine day stay at the Webb home, [Mother] and [Paula] would not go outside much due to [Mother's]

concern with being discovered. [Mother] admitted that when she did take [Paula] out in public she made [Paula] use false names like "Zoe" and "Eleanor."

. . . .

16. One afternoon [Webb] came home and found both [Mother] and [Paula] missing. When she searched and could not find them in the home, she walked down toward the river and found them walking back from there. When [Webb] confronted [Mother], [Mother] acted guilty like she had been "caught." At this point, [Webb] decided that [Mother] may pose a real and serious threat to [Paula]. [Webb] then contacted both the Ohio and Indiana Sheriff's Departments multiple times. After getting no immediate response, she contacted [Father's] family. This ultimately led to the recovery of [Paula] shortly thereafter by Ohio authorities. Once [Paula] had been recovered, [Mother] made the statement to [Webb] that she would "like to kill whoever turned her in to DSS."

. . . .

21. [Mother] intentionally violated court orders and avoided arrest for 5 ½ years. She deliberately concealed [Paula] with the active aid and support of her family, including her mother and sister who lied to the Court in Indiana about the presence of [Mother] and [Paula]. [Mother] testified that both her mother, Karen Duncan, and her sister, Tiffany Midkiff, lied at a [30 May 2012], hearing in Indiana regarding the presence of both [Mother] and [Paula] at their Indiana home. Further, [Mother] admitted that numerous letters from [Father's] counsel . . . which had been sent to the Noblesville address and other addresses of [Mother] had all been rejected and "returned to sender." [Mother] stated that she was actually living at each address at the time, and that the writing on the letters to return them was her "mother's" handwriting. It is obvious to the [trial court] that [Mother] had to be aware of the Court proceeding in Indiana on [30 May 2012], since

both her mother and sister showed up at that time and testified. [Mother] testified that her mother and sister did not tell her they went to the [30 May 2012] hearing until 2015. However, [the trial court] does not believe her. It is also obvious to the [trial court] that each time the authorities closed in on [Mother] and her family, that the family would simply move [Mother] and [Paula] to another location. In fact, for one 5-month period (from April of 2012 to August of 2012), Karen Duncan paid for [Mother] and [Paula] to live in extended stay hotels in various areas of Indianapolis, Indiana, solely to avoid an outstanding body attachment and court proceedings in Indiana. Since [Mother] had no regular job or visible means of support, she was entirely dependent upon her family for the support of herself and [Paula] during this time. It is also obvious that [Mother] was in regular contact with her family during this entire time since she required their regular aid and assistance.

. . . .

33. Both [Paula's doctor,] Dr. Wilson[,] and [Paula's counselor,] Counselor Griffin[,] further opined that such deceptive behavior by [Mother] was actually a mechanism of control over [Paula], as was [Mother's] breast feeding of [Paula] until a late age, the self-diagnosis of numerous false allergies, the refusal to immunize her, the refusal to allow her to attend school, the refusal to obtain a birth certificate or social security number, and the refusal to let her use her real name in public. Not only did these things all exhibit control, but they also demonstrated in Dr. Wilson's words, a disturbing level of "paranoia" and "narcissism" by [Mother]. Dr. Wilson was particularly concerned from a medical standpoint that [Mother] had withheld all medical care and immunizations from [Paula] for no justifiable reason for 5 ½ years. [Paula] had even been born at home with no prenatal care from any medical doctor. Dr. Wilson opined that this was all unnecessary, dangerous behavior in regard to [Paula]. . . . .

34. It is obvious to the [trial court] that [Mother's] plan to conceal [Paula] from [Father] for 5 ½ years included the taking of unwarranted and even life-threatening health risks for [Paula]. It is equally obvious to the [trial court] that [Mother] is still in denial about her responsibility for hiding and concealing [Paula] from [Father] for 5 ½ years. . . . .

34. The [trial court] further believes that [Paula] would benefit from some additional counseling to deal with the anger issues which she has experienced . . . . Any counselor selected by [Father] for such purpose should be provided copies of all testing, notes, reports and other information which is produced by [Mother's] psychiatrist. The counselor is not required to do so but may also do counseling sessions with [Mother] if and when it is deemed necessary or advisable by the counselor.

. . . .

36. [Mother's] continued violations of rules of the supervising agencies, Our House and SonShine Child Care, *shows the [trial court] that she will not follow the orders of [the trial court].*

(Emphasis added).

¶ 43    "[I]t is well established by this Court that where a trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal." *Cushman v. Cushman,* 244 N.C. App. 555, 558, 781 S.E.2d 499, 502 (2016). Mother has not challenged any of the above-mentioned findings of fact, and they are therefore binding on us.

¶ 44    These unchallenged findings of fact and the challenged findings of fact supported by substantial evidence demonstrate Mother's behaviors have been more

harmful than beneficial to Paula and many of Mother's actions will have life-long mental, physical, and emotional consequences for Paula. Further, Mother remains a flight risk and refuses to comply with the rules of the visitation agencies. Most importantly, Mother has shown and the trial court explicitly found, in Finding of Fact 36, that *she will not follow court orders*. We emphasize the importance of this unchallenged and binding finding regarding a party's unwillingness to comply with court orders.

¶ 45     While Mother argues "the trial court's concerns regarding the possibility that [Mother] would flee with [Paula] are adequately addressed by limiting visitation to supervised visitation within the home county[,]" she fails to acknowledge the fact that Mother continues to disobey the rules of the supervising agencies and has continually caused disruptions during visitations with Paula. Moreover, unchallenged Finding of Fact 30 states, in part, "[Mother's] actions suggest to the [trial court] that she was attempting to get the police or DSS to place [Paula] in her custody that day on [31 July 2018]" when Mother brought an off-duty police officer to the visitation center and caused a disruption. Mother has also historically disobeyed and circumvented orders of the courts. The trial court's determination that limiting visitation to supervised visitation within the home county was not feasible is supported by the Record.

Considering the evidence and findings that Mother has already demonstrated a proclivity and ability to readily avoid court orders, arrest warrants, and hearings during the five-and-a-half years she had Paula in her custody, has contemplated killing Father, has had access to a gun, and has had homicidal and suicidal thoughts regarding Paula and herself, Findings of Fact 6 and 39 and Conclusion of Law 4 are supported by the findings of fact in the Record. "It is not in [Paula's] best welfare and interests that [Mother] exercise any visitation."

## CONCLUSION

The trial court did not err when it denied visitation between Paula and Mother. Substantial evidence and unchallenged findings of fact support the findings of fact challenged by Mother, and the findings of fact support the trial court's conclusion of law that it is not in Paula's best interest to have visitation with Mother.

AFFIRMED.

Judges INMAN and WOOD concur.